NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190796-U

NO. 4-19-0796

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 5, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| PAPY M. MANIWA, | ) | No. 18CF278 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott D. Drazewski, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:   (1) Defendant was not denied his right to be present when the trial court viewed, outside defendant's presence, video that had been admitted into evidence;

(2) Due to the trial court's admonition defense counsel clarify defendant's testimony or the court would do so, defendant was not denied the effective assistance of counsel when defense counsel chose to elicit testimony that clarified defendant's admission to one of the charges rather than subject defendant to questioning by the court.

¶ 2     After a bench trial, defendant, Papy M. Maniwa, was convicted of four counts of child pornography (720 ILCS 5/11-20.1(a)(2) (West 2018)). The trial court sentenced defendant to consecutive terms of six years' imprisonment on each count. Defendant appeals his convictions, arguing (1) his right to be present at all critical stages of his trial was violated when the trial court viewed video recordings outside his presence and (2) he was denied the effective

assistance of counsel when trial counsel's clarifying questions led him to admit count III. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          Defendant's trial was held in August 2019. The State called one witness, Brad Park, a community service officer. Officer Park testified he was a detective with the Normal Police Department when he investigated this case. Officer Park, who had been assigned to the Internet Crimes Against Children Task Force, was informed a video containing possible child pornography had been uploaded through Facebook. Facebook provided Officer Park the username (Androus Maniwa), the date and time of the upload, the Internet Protocol (IP) address to which the video was uploaded, and the video. Through his investigation, Officer Park learned the IP address belonged to Sandrine Ukanda, defendant's wife. Officer Park also learned the Facebook account belonged to defendant.

¶ 5          Officer Park testified he made contact with defendant at defendant's workplace. Defendant willingly accompanied Officer Park to the police department to participate in a recorded interview on March 15, 2018. Officer Park asked about the video. Defendant asked to see the video to verify he knew what Officer Park was referencing, and defendant verified the video from a still shot. Defendant told Officer Park he used Facebook and WhatsApp, a global application that allows individuals to send messages to people in other countries. Defendant verified he used the name "Androus Maniwa" for his account but his name was Papy. Defendant told Officer Park he received several videos dealing with pornography. He could not say the exact way he received the video. Defendant agreed after he took possession of the video, he sent it to several different people. When asked if defendant provided a reason for sending the video, Officer Park testified "at first he said he feels that the world is ending based upon these types of

videos and then later mentioned that he sends these videos out to inform others what could happen to [their] children if [they] allow other people to watch them." Officer Park asked defendant to consent to a search of his phone. Defendant agreed and provided the password.

¶ 6　　　At this point in Officer Park's testimony, the State moved to admit into evidence the video of the interview, which the trial court did. The State informed the court the parties agreed to stipulate to allow the court to watch all videos in chambers instead of playing them in open court.

¶ 7　　　Officer Park further testified, after defendant left the police department, Officer Park began to search defendant's phone. In doing so, Officer Park found "multiple other instances of alleged child pornography." Regarding the video that triggered the investigation, Officer Park learned it was disseminated on January 26, 2018. The video was of a six- to eight-year-old male having vaginal intercourse with an adult female (count I video). Another video of child pornography was sent 10 to 15 minutes later. That video was of an adult male having anal sex with a one- to two-year-old male (count II video). Two more videos of child pornography were found and sent. One, sent on February 22, 2018, included an adult male and female with a very young female and very young male. The adult female appeared to be providing oral sex to the young male child (count IV video). Another video sent on February 2, 2018, showed a five- or six-year-old female providing oral sex to an adult male (count III video). Officer Park testified he was able to ascertain the videos had been disseminated. Through questioning, Officer Park's testimony explicitly establishes all but the count III video were disseminated through WhatsApp. Officer Park testified the count III video had been disseminated but did not identify the means of dissemination.

¶ 8　　　According to Officer Park, he interviewed defendant for a second time a day or so

after the first interview. There were concerns the female in the count III video was defendant's daughter, so defendant was brought in for questioning. It was determined through interviews of defendant and his wife the female in that video was not their daughter. Defendant acknowledged he possessed the videos. He acknowledged he disseminated the videos. He was unable to say to how many individuals he sent the videos. Defendant reported sending them to "multiple people."

¶ 9 During Officer Park's testimony, the State handed Officer Park the State's exhibit No. 3. Officer Park identified the exhibit as a DVD containing the four child-pornography videos. Officer Park reviewed each individual video to ensure each was a fair and accurate depiction of the videos found on defendant's phone. The count I video was taken from Facebook and not from defendant's phone. That same video was, however, located on defendant's phone. On the count II video, because the department was "unable to forensically download the information from [defendant's] phone," Officer Park used his "department cell phone to do a what's pretty much a screen recording of what's on his phone." For the count II video, Officer Park narrated as he scrolled through defendant's WhatsApp account and located the child-pornography videos. The count III video was a video of defendant's wife's phone. Defendant told Officer Park he sent that video to her. The count IV video was captured the same way as the count II video was in State's exhibit No. 3. At this time, the State moved to enter State's exhibit No. 3 into evidence. Defense counsel did not object. The trial court deemed the video admitted.

¶ 10 On cross-examination, Officer Park acknowledged defendant was very forthcoming and very cooperative during the investigation. Officer Park testified he learned defendant was a medical doctor from Democratic Republic of the Congo. Defendant "participated in helping kids" there. Officer Park agreed when he explained what was characterized as child pornography, defendant's "reaction seemed pretty appalled, pretty

- 4 -

shocked." Officer Park agreed defendant showed him some of the conversations that were in French that were on WhatsApp or through Facebook. Defendant interpreted those conversations for Officer Park. The conversations regarding the videos were more like "this is appalling, I'm going to tell everybody." Officer Park agreed the conversations were not "this is such great porn."

¶ 11    Officer Park agreed no evidence was found in defendant's cell phone or in his home regarding child-pornography production. Other devices in the home were searched, including defendant's laptop and his wife's phone. No internet search history was related to child pornography.

¶ 12    On redirect examination, Officer Park testified he asked defendant if he were to look at defendant's internet-search history, would he find anything in regards to searching for child sex. According to Officer Park, defendant said "there may be some search history for that." Also, during the interview, defendant acknowledged he received child-pornography videos often.

¶ 13    Defendant testified on his own behalf. Defendant, age 43, arrived in the United States in 2014 to provide a good education for his children. Defendant was working on a master's degree in "[p]lanning and intervention in healthcare" online through a French university. He had completed one year when he was arrested. Defendant stated he did not know he was doing anything illegal.

¶ 14    Regarding the count I video, defendant testified the officer told him there was a task force and defendant had sent a video to a man called "Radet." Defendant asked the officer if he could see the video, because Radet was a friend of his who lived in France and they exchanged "a lot of videos." Defendant stated Radet sent the video to him. Defendant denied telling Officer Park there were "a lot of other videos" but stated only that it was possible other

videos that had to do with his family were on his computer.

¶ 15         On cross-examination, defendant denied sending the count I video to anyone. He did not recall sending the count I video to his wife. Defendant stated, "[T]here's a case that took place in South Africa where a young girl was abused by an adult and that this video I sent it to my wife and really it was—it was on WhatsApp." The following questions and answers occurred:

"[THE STATE]: Do you recall telling the detective that you sent the video to somebody else?

A. Let me be clear here. So the first video—when I was arrested and the investigation took place because of the first video and it was clear that I did not send it. Now, I just told the detective that there is a video—there's a case that took place in South Africa where a young girl was abused by an adult and that this video I sent it to my wife and really it was—it was on WhatsApp.

* * *

"[THE STATE]: Throughout your interview with the detective, either interview, you acknowledged that you sent the videos to other individuals, correct?

A. Actually, the detective asked me just about this video, South Africa video, and then I told him I sent it to my wife and other people to be—

[THE STATE]: The videos that you are charged with sending, you acknowledged to sending those out?

A. I haven't even seen the other videos, you know? I just saw the first one because he showed it to me, and the second about South Africa, I told him about it. That's all.

[THE STATE]: Your Honor, I have no other questions for him.

THE COURT: All right. It's a bench trial[,] and I have to admit that there's this whole issue of some South African video that has not been explained other than being described as a South African video. I need to have some additional information about that or to justify or have the court put in perspective are we talking about the first video, are we talking about none of the videos? The defendant offered something about a South African video, and there's no evidence in the case with respect to the origination of such a video to a particular location.

So either counsel can bring it out or I can bring it out, since it's a bench trial, since it needs to be clarified, but there's nothing to tie in with a video origination from a particular country or location.

[THE STATE]: I don't know what video he is talking about.

THE COURT: Okay. Well, there's redirect, so if [defense counsel] wishes to explore redirect, he may. I'm not directing him to do so. I'm merely indicating that at this point in time that the

court has absolutely, positively no knowledge whatsoever as to what the defendant is referring to when he describes one of the videos as being a, quote, South African, unquote, video.

[DEFENSE COUNSEL]: May I?

THE COURT: Yes.

[DEFENSE COUNSEL]: Thank you.

***

[DEFENSE COUNSEL]: Which video are you describing as being the South African video?

A. It's the video where there's a child that they thought it was my daughter. That's the video that I'm talking about."

* * *

[DEFENSE COUNSEL]: Does that clarify?

THE COURT: No, no. I appreciate counsel's attempts and willingness to try to streamline things, but without [my] having seen the videos, without [my] having seen the interviews, the defendant's testimony does not—I don't understand all of it and so—

[THE STATE]: Would it help if we referenced the count?

THE COURT: It would help if counsel agreed, before the defendant is examined, as to which of the counts and the videos are being referred to because then I need to put in perspective also what the defendant said at the conclusion of cross examination

- 8 -

which was he never sent out any video except for the, quote, South African video, unquote.

So here's what would help me right now, which is during direct examination of Officer Park, the State had him describe various videos, Counts I, II, III, and IV, which of those videos in Counts I, II, III, or IV was the video where he was questioned in his second interview about a possible connection to one of the—to the child, I should say, in that video, potentially being his daughter?

[DEFENSE COUNSEL]: Count III.

[THE STATE]: Count III.

THE COURT: All right. That helps. Now, hold on.

And so I don't want to engage in cross examination, I want to understand his testimony. Is the defendant's testimony, then, that the only video that he sent to anyone else was the video in Count III?

[DEFENSE COUNSEL]: I can clarify that on redirect, your Honor.

THE COURT: Okay. Sure.

[DEFENSE COUNSEL]: Sir, are you admitting that you sent a video?

A. Yes, one.

Q. Which one?

- 9 -

A. The video where they thought the child was my daughter.

Q. That would be Count III, the video alleged in Count III, right?

THE COURT: He may not know that. If counsel are stipulating that that is the video—

[DEFENSE COUNSEL]: We are stipulating, your Honor."

¶ 16 State's exhibit No. 2 is a video of defendant's second interview with Officer Park, and it is dated March 16, 2018. Officer Park was concerned that a video on defendant's phone showed a girl, about the same age as defendant's daughter, performing oral sex on a male. Officer Park told defendant a photo of the girl in the video was shown to her school principal and the principal identified the girl as defendant's daughter. Defendant denied his daughter was in the video. Defendant said the girl could not be his daughter as he and his wife do not leave their daughter with others. Defendant received the video from his friend, "Diana," in Georgia. Officer Park showed defendant the video. Defendant said, "I know the video." Defendant shared the child-pornography videos to parents to warn them to watch out for their kids. Officer Park, while scrolling through defendant's phone, told defendant that defendant sent the video to his wife on February 2. Diana sent that video to tell him he and his wife need to be careful with their children.

¶ 17 In the interview, defendant said most of the time the child-pornography videos were sent to him. Officer Park asked if there would be any reason searches for child pornography would appear in his internet history. Defendant responded, "Maybe to see abuse around the world." Defendant said he searched about abuse. Officer Park sought to confirm defendant sent

"videos of child pornography" to his wife; defendant said, "Yeah." Defendant stated, "People share to me and then I see and then I share to other people."

¶ 18    Before ending the questioning part of the interview, Officer Park reiterated he believed defendant was the man in the video. Defendant told Officer Park, "You can see the video before when I sent to my wife. There is a woman who talked about that video. The woman who talk[ed]—it was something that happened maybe in South Africa. But when we received that video we see an explanation in the video on Facebook that woman explained what happened in that video."

¶ 19    State's exhibit No. 3 contains the four videos that were the bases for the charges against defendant. As Officer Park scrolled through defendant's phone to show the WhatsApp conversation thread between defendant and Sandrine regarding the count II video, the count I video appears in that thread. The WhatsApp application shows the videos were successfully sent by defendant and viewed by the recipient. The count III video was located on Sandrine's phone. The WhatsApp application shows the video was sent from Sandrine's phone to "Ya Ivette." The count IV video was narrated by Officer Park as he scrolled through the WhatsApp messages on defendant's phone. In this video, the adult female provided fellatio on a minor male and minor female. The WhatsApp application shows the video was sent and viewed by the recipient.

¶ 20    Upon the completion of testimony on August 27, 2019, the court was in recess until September 12, 2019. When proceedings reconvened, the trial court noted it had reviewed the State's exhibits. The court then allowed counsel to proceed with closing argument.

¶ 21    On November 5, 2019, the trial court found defendant guilty of all counts. In rendering its verdict, the trial court agreed the videos portrayed the events as described by Officer Park. The court noted defendant was consistent in his explanation for sending the videos

- 11 -

as a means to warn others of the dangers of not watching your children but concluded that reason was not an affirmative defense under the statute.

¶ 22     At sentencing, the trial court began by stating the following: "There are certain times—and this is about you, Mr. Maniwa, not me. But there are certain times in my career as a judge when I may feel that the end result is unjust. This is one of those occasions." The court expressed it did not believe defendant sent the videos for sexual gratification but noted that was not a defense under the statute. The court stated it was required under the law he must sentence defendant to consecutive terms. He sentenced defendant to the minimum of 6 years' imprisonment on each count, 24 years in total.

¶ 23     This appeal followed.

¶ 24                              II. ANALYSIS

¶ 25                    A. Defendant's Right to Be Present

¶ 26     Defendant argues he was denied his constitutional right to be present at all critical stages of his trial when he was not present for the trial court's viewing of State's exhibit No. 3. Defendant maintains the record shows the court did not watch State's exhibit No. 3 in defendant's presence, defendant was unaware of the content of videos within that exhibit, and defendant did not waive his right to be present. Defendant contends his absence from this critical stage denied him due process. While acknowledging the issue was not preserved for appellate review, defendant argues, under *People v. Lucas*, 2019 IL App (1st) 160501, 141 N.E.3d 341, we should reverse under the plain-error doctrine.

¶ 27     Our first query under the plain-error doctrine is whether a clear or obvious error occurred when the trial court viewed the videos in State's exhibit No. 3 outside defendant's presence. See *People v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403, 413 (2010) (showing

the first step in plain-error analysis is the determination of whether clear or obvious error occurred). If we find clear or obvious error, we may remedy an otherwise unpreserved error if we find (1) the evidence was closely balanced or (2) the error was sufficiently grave it affected the trial's fairness and challenged the integrity of the judicial process. *Id.*

¶ 28 Under both the Illinois and United States Constitutions, an accused has a general right to be present at all critical stages of criminal proceedings. *People v. Lindsey*, 201 Ill. 2d 45, 55, 772 N.E.2d 1268, 1275 (2002). Whether this right has been violated involves two considerations: (1) whether the criminal proceeding in which defendant was not present was a "critical stage" and (2) whether "defendant's absence caused the proceeding to be unfair or if his absence resulted in a denial of an underlying substantial right." See *id.* at 55, 57. We are mindful defense counsel cannot waive a defendant's right to be present at a critical stage or proceedings on the defendant's behalf. See *People v. Lofton*, 194 Ill. 2d 40, 66, 740 N.E.2d 782, 797 (2000).

¶ 29 The question of whether the defendant's absence occurred at a critical stage is answered by considering whether "the defendant's presence at the proceeding would have contributed to his opportunity to defend himself against the charges." See *id.* at 67. If defendant's " 'presence would be useless, or the benefit but a shadow,' " the privilege of presence is not guaranteed. *Id.* (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106-07 (1934)). We review *de novo* the question of whether a proceeding is a "critical stage." *People v. Young*, 2013 IL App (4th) 120228, ¶ 23, 996 N.E.2d 671.

¶ 30 Defendant relies heavily on *Lucas* and contends, as in *Lucas*, his absence occurred at a critical stage of the proceedings because it occurred during the presentation of evidence at trial. See *Lucas*, 2019 IL App (1st) 160501, ¶ 15. In *Lucas*, a bench trial was held on charges the defendant drove under the influence of alcohol and resisted a peace officer. *Id.* ¶¶ 1, 4. Before

- 13 -

testimony began, the State sought to publish a video of the defendant's traffic stop, which was captured by an officer's squad car. *Id.* ¶ 5. Both parties stipulated to the video's authenticity. *Id.* The trial court told the defendant because the courtroom lacked video capabilities it would view the video in chambers in the attorneys' presence. *Id.* The court recessed the proceedings to watch the video and did so. *Id.* ¶¶ 5-6. After reconvening proceedings, the court admitted the squad-car video into evidence. *Id.* ¶ 6.

¶ 31        We do not agree *Lucas* should be applied here. State exhibit No. 3 was not viewed during the presentation of evidence during trial but after that evidence had been *admitted*. As Justice Steigmann wrote, "a trial judge's consideration of already admitted evidence does not constitute a 'hearing' " or proceeding. *People v. Duckworth*, 2021 IL App (4th) 180740-U, ¶ 145 (Steigmann, J., concurring). In such circumstances, much like the trial court's review of admitted documentary evidence (*id.* ¶ 146), a defendant's presence would not have contributed to his ability to defend himself and thus did not occur at a critical stage of proceedings.

¶ 32        Here, defendant's presence during the trial court's viewing of admitted evidence would have been useless. Defendant was present when the evidence was admitted, at a time when defendant could have challenged the admissibility of that evidence. He was present when argument was made regarding the evidence. See *Young*, 2013 IL App (4th) 120228, ¶ 24 (finding the defendant's right to be present was not denied when the defendant was present for the proceedings before the DVDs were viewed and during argument about whether statements from the DVDs should be admitted but not during the viewing itself); see also *People v. Richardson*, 2021 IL App (1st) 190821, ¶¶ 4, 45, 61 (following *Young*). Because defendant's presence at the court's *viewing* of admitted evidence would not have "contributed to his opportunity to defend himself against the charges" (*Lofton*, 194 Ill. 2d at 72), defendant was not denied the right to be

- 14 -

present at a critical stage of proceedings.

¶ 33                                B. Effectiveness of Counsel

¶ 34        Defendant further contends his trial counsel provided deficient representation when he elicited a confession to count III. Defendant points to the end of his cross-examination by the State and to the trial court's comments indicating it was confused by defendant's reference to a "South Africa" video. Defendant argues counsel, by asking the clarifying questions linking his admission to sending the "South Africa" video to an admission of sending the count III video, failed to subject the State's case to meaningful adversarial testimony and such failure was presumptively prejudicial under *United States v. Cronic*, 466 U.S. 648 (1984). Alternatively, defendant argues counsel's deficient performance prejudiced him as it resulted "or reasonably might have resulted" in defendant's conviction on count III.

¶ 35        In asserting this claim, defendant likens the circumstances of this case to those in *People v. Hattery*, 109 Ill. 2d 449, 488 N.E.2d 513 (1985). In *Hattery*, the defendant pleaded not guilty to murder charges. *Id.* at 458. Defense counsel, despite that plea, pursued a tactic from opening statement through closing argument to admit the murder charges in order to avoid the death penalty. *Id.* 458-59. On appeal, the defendant argued he was denied the effective assistance of counsel as counsel's strategy "amounted to the functional equivalent of a guilty plea," inconsistent with his plea of not guilty. *Id.* at 458.

¶ 36        In reaching its decision the defendant was denied the effective assistance of counsel, the *Hattery* court summarized two companion cases, *Strickland v. Washington*, 466 U.S. 668 (1984), and *Cronic*, 466 U.S. at 648. *Hattery*, 109 Ill. 2d at 460-61. Regarding *Strickland*, the *Hattery* court began by observing courts generally do "not second-guess defense counsel's judgment and trial strategy" and thus there is " 'a strong presumption that counsel's conduct falls

- 15 -

within the wide range of reasonable professional assistance.' " *Id.* at 460-61 (quoting *Strickland*, 466 U.S. at 689). Accordingly, *Strickland* establishes a two-part test for considering ineffective-assistance-of-counsel claims, which requires a defendant show both "his counsel's performance 'fell below and objective standard of reasonableness' " and " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Hattery*, 109 Ill. 2d at 461 (quoting *Strickland*, 466 U.S. at 688, 694). In contrast, *Cronic* concerns circumstances so likely to prejudice the defendant that the prejudice prong of *Strickland* need not be proven but will be presumed. *Hattery*, 109 Ill. 2d at 461. This occurs when " 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing,' " as " 'there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.' " *Id.* (quoting *Cronic*, 466 U.S. at 659).

¶ 37 The *Hattery* court found the defendant was denied counsel under *Cronic*, concluding the State's case was not subjected to meaningful adversarial testing and "counsel's actions deprived [the] defendant of the right of having the issue of his guilt or innocence presented to the jury as an adversarial issue." *Id.* at 464. The court observed counsel's concession of the defendant's guilt was unequivocal and was at odds with his not-guilty plea. *Id.*

¶ 38 This situation is not, however, like *Hattery*. Defense counsel did not elicit defendant's confession to count III as part of trial strategy or on his own volition. Instead, defense counsel's decision to clarify defendant's admission to disseminating the "South Africa" video followed the trial court's admonition "either counsel can bring it out or I can bring it out, since it's a bench trial, since it needs to be clarified, but there's nothing to tie in with a video origination from a particular country or location." Although the State indicated it did not know what defendant was referring to, defense counsel made no such remark. The evidence shows,

- 16 -

once the trial court viewed the videos admitted during trial, the trial court would have known defendant's admission to sending the "South Africa" video was an admission to count III. During cross-examination by the State, defendant admitted to sending the video that took place in South Africa where a young girl was abused by an adult to his wife on WhatsApp. State's exhibit No. 2 contains a video of the second interview. In that interview, Officer Park, who believed defendant's daughter was the girl in the count III video, questioned defendant almost exclusively about the count III video, a video of a young girl being abused by an adult. The interview briefly touched on the count I video, which does not include a young girl. Officer Park did not specifically question defendant about the count II video or the count IV video, the latter of which is the only other video that contains a young girl. Moreover, at the end of the second interview, when discussing the count III video and Officer Park's belief defendant's daughter was in that video, defendant suggested the video showed something that happened in South Africa. Thus, knowing the trial court, upon viewing the evidence, would conclude the "South Africa" video was the count III video, defense counsel opted for clarifying the matter with a few questions rather than subject defendant to questioning by the trial court.

¶ 39　　　　Defense counsel's actions thus did not deny defendant his right of having his guilt or innocence presented to the factfinder. Instead, defense counsel's course of action limited the admission to one count and prevented additional questioning by the trial court. Defense counsel's decision was tactical and reasonable under the circumstances. Neither *Cronic* nor *Strickland* requires reversal.

¶ 40　　　　　　　　　　　　III. CONCLUSION

¶ 41　　　　We affirm the trial court's judgment.

¶ 42　　　　Affirmed.