2023 IL App (1st) 220044-U

No. 1-22-0044

Order filed August 7, 2023.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 16478 |
| | ) | |
| TYRONE CAVITT, | ) | The Honorable |
| | ) | Angela M. Petrone, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We find no plain error where the trial court viewed video of the alleged offense and
defendant's statement only in chambers, outside defendant's presence. Defendant
failed to show that he was deprived of the opportunity to defend himself or of the
knowledge needed to decide whether to testify by the court's action because the
videos concerned matters of which defendant had firsthand or direct knowledge.
The evidence of defendant's guilt of aggravated unlawful use of a weapon was not
closely balanced, where he gave a statement admitting the object he held was a
loaded firearm.

¶ 2     Following a bench trial, defendant Tyrone Cavitt was convicted of aggravated unlawful use of a weapon (AUUW) and sentenced to three years' imprisonment. On appeal, defendant contends that the court deprived him of his right to be present at all critical stages of the proceedings when it viewed key video evidence – a security video and defendant's statement – outside his presence. For the reasons stated below, we affirm.

¶ 3     Defendant was charged with AUUW for knowingly possessing a firearm, not on his own land, in his own home or business, or on another's land by permission, on or about October 28, 2018, when he had not been issued a valid firearm owner's identification card (FOID card). 720 ILCS 24-1.6(a)(1), (a)(3)(C) (West 2018).

¶ 4     At the October 2021 trial, the parties entered into four stipulations. First, if called, police officer Maria Delatorre would testify that she and another officer responded at about 2:15 a.m. on October 28, 2018, to a report of shots fired at a particular location, where she saw two wounded men (one of whom died later). The officer learned the men were leaving a party when an altercation broke out. She saw multiple shell casings and live rounds in the gangway aside and the alley behind the scene. Second, if called, the owner of property near the scene would testify that he had a working security camera aimed at the alley, and that it recorded events in the alley on the early morning of October 28, 2018. A detective would testify that he made an accurate copy of that video recording.

¶ 5     The third stipulation was that, if called, Detectives Kristi Battalini and Chana Aubert would testify that they investigated the shooting and learned from several witnesses that defendant was at the scene around the time of the shooting. One witness had viewed the security video and identified defendant as a man fleeing the scene. The detectives would also testify that they

questioned defendant after his arrest in January 2019. In the interview, defendant waived his *Miranda* rights and identified himself, from a still photograph from the security video, as one of the men fleeing the scene. He admitted that he possessed a gun that night but denied involvement in the shooting. No firearm was recovered. The parties stipulated that the detectives' interview of defendant was electronically recorded, and a copy of the recording truly and accurately depicted the interview.

¶ 6     The parties' fourth stipulation was that, on October 28th, 2018, defendant was 20 years old and had not been issued a valid FOID card.

¶ 7     Without objection, the security and interview videos were admitted into evidence, as was the still photograph from the security video that Detectives Battalini and Aubert showed defendant during his interview.

¶ 8     The State rested, the court ascertained from defendant that he chose not to testify, and the defense rested. The State and the court then discussed the sections of the video the court should review. The court confirmed with the parties that they had agreed the court would view the security and interview videos after hearing closing arguments. Defense counsel agreed. Following closing arguments, during which both the State and defense counsel discussed the content of the videos in detail, the court stated that it would view the videos and consider the stipulations and arguments, then adjourned for several days.

¶ 9     The security video, which is included in the record on appeal, is marked as being from the early morning of October 28, 2018. The video shows, in relevant part, a group of persons running down an alley past the camera, including a person passing a dark object behind him or her to

another person as they ran. The still photograph from the video also shows a person in the process of passing or handing something to another person.

¶ 10    Defendant's videotaped statement is also included in the record on appeal. Therein, defendant, after being informed of his rights, states that he and his cousin Arturo were attending a party on October 28, 2018, where gang members were present. In defendant's experience as a party promoter, attendees at some "but not most parties" were patted down. A fight broke out, and the party ended. In the alley afterwards, defendant saw someone in a black shirt and black cap pull out an object and "cock it back," making a sound. Defendant agreed with the detective that the person racked a gun. Shooting began, and defendant fled. He denied having a gun, and specifically denied having been passed a gun, that night.

¶ 11    However, when the detective showed defendant a still photograph from the security video, he identified himself and Arturo in the photograph. A gang member called Joker brought the gun to the party and gave it to Arturo, and defendant took it from Arturo as he was only 16 years old. Defendant later passed the gun back to Arturo to return to Joker. When the detective asked what kind of gun it was, defendant shrugged, said he was "not very good with guns," and denied the gun was a revolver, agreeing with the detective that it was a semiautomatic. When the detective asked if the gun was loaded, defendant replied "Yeah, it was, it felt heavy." He denied owning a gun or "often" carrying a gun but admitted he could get one if he wanted one.

¶ 12    At the next court session, the trial court found defendant guilty of AUUW. The court noted that:

> "defendant is shown on surveillance video, running in a group of people, immediately after two persons were shot, one fatally. Defendant was seen holding a black object that was in

the shape of a handgun. He was seen handing that object off to another person who was running in the same direction as he and who was physically close to him. On police audio and visual recording, defendant identified himself in a still photo taken from that surveillance video as the person who was running and who was holding a gun and who passed the gun to Arturo."

The court found that:

"Defendant showed his familiarity with guns by stating that: 1) he attends and promotes parties where people are sometime patted down for guns before entering; 2) he does not own a gun but can get a gun if he wants one, from his friends; 3) he saw a person wearing black with a gun and heard the person rack the slide of the gun before telling people to get back; 4) a person named Joker brought a gun to the party and gave the gun to defendant's cousin, Arturo, who wanted to hold it because he thinks it's cool; 5) defendant took the gun from Arturo because he did not want Arturo to have it; 6) defendant was holding the gun and knew it was loaded because it felt heavy; 7) defendant described the gun as not a revolver and resembling a semi-automatic; and 8) defendant gave the gun back to Arturo as he and Arturo were fleeing from the scene of the shootings."

The court found the object was a firearm at least in part because of defendant's statement that he believed the gun to be loaded because it felt heavy.

¶ 13    Defendant's posttrial motion challenged the sufficiency of the trial evidence. It did not challenge the court's viewing of the security video or statement outside of his presence. Defense counsel stood on the written posttrial motion and the court denied it. Following a sentencing hearing, the court sentenced defendant to three years' imprisonment. This appeal timely followed.

¶ 14     On appeal, defendant contends that the court erred by viewing key evidence – video recordings of the incident and his statement – outside his presence. He contends that the court violated his right to be present at critical stages of the proceedings by viewing the videos outside his presence without obtaining his knowing and intelligent waiver of his right to be present.

¶ 15     As a threshold matter, defendant acknowledges that trial counsel did not object to the court viewing the videos outside defendant's presence. Defendant also did not claim in his posttrial motion that this constituted error. A claim not raised by objection and preserved in a posttrial motion is forfeited. *People v. Mudd*, 2022 IL 126830, ¶ 21. Defendant requests we review the issue under the plain error doctrine, contending the trial court's error meets both prongs of the doctrine.

¶ 16     This court will consider a forfeited error if it is plain error; that is, if a clear or obvious error occurred and either (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice, or (2) the error was so serious that it alone affected the fairness of the proceedings. *Id.* ¶¶ 21-22. Here, we find neither prong of plain error. We shall first address the second prong of plain error as it applies particularly to the issue of a defendant's presence in court.

¶ 17     A criminal defendant has the right to be personally present at critical stages of the proceedings against him or her if his or her presence would contribute to the fairness of the procedure. *People v. Lofton*, 194 Ill. 2d 40, 67 (2000). A defendant has the right to be present whenever his or her presence bears a reasonably substantial relationship to having a full opportunity to defend against the charges, even where the defendant is not actually confronting witnesses or evidence against him. *Id.* at 66. Where the right to be present exists, a defendant must waive that right knowingly and voluntarily. *Id.* at 73.

¶ 18    Conversely, the right to be present is not absolute, and a defendant's absence from even a critical stage of the proceedings will not constitute second prong plain error unless it caused the proceeding to be unfair or resulted in a denial of an underlying substantial right such as the right to confront witnesses, present a defense, or be tried by an impartial jury. *People v. Brown*, 2023 IL 126852, ¶ 15; *People v. Lindsey*, 201 Ill. 2d 45, 57 (2002). A defendant cannot rely on broad principles not applicable to the specifics of his or her case but must establish in light of the entire record that the fairness of his or her proceedings was affected by his or her absence. *Lindsey*, 201 Ill. 2d at 57-58. That said, we recount caselaw that guides our analysis in applying these principles to the specifics of the instant case.

¶ 19    In *Lofton*, where the defendant was not present for a hearing on the substantive admission of out-of-court statements by the alleged child victim of physical or sexual abuse (*id*. at 64, 71) (citing 725 ILCS 5/115-10 (West 1996)), our supreme court stated:

"In light of the entire record, we cannot say that there is nothing defendant could have done had he been present at the section 115-10 hearing and nothing he could have gained [citation]. Numerous details, possibly disadvantageous to the State's position, about precisely how [the child] came to accuse the defendant were elicited at trial at which defendant was present, whereas virtually none were elicited at the section 115-10 hearing the day before from which he had been absent. *** The record suggests that defendant's presence at the section 115-10 hearing would have contributed to his ability to defend himself against the charges." *Id*. at 71-72.

The *Lofton* court therefore found that,

"Because the record indicates that defendant's presence at the section 115-10 hearing would have contributed to the fairness of the criminal proceeding against him and that a fair and just hearing was thwarted by his absence, we conclude that the section 115-10 hearing was a stage critical to the outcome of the criminal proceeding at which defendant had a right to be present." *Id.* at 72-73.

¶ 20    In *People v. Lucas*, 2019 IL App (1st) 160501, ¶¶ 4-7, where a defendant was convicted in relevant part of driving under the influence, the trial court viewed video of her traffic stop in chambers with counsel but not the defendant present, and stated that it relied at least in part on the video in finding the defendant guilty. This court found second-prong plain error (*id.* ¶ 21), finding that the defendant's "absence from the video viewing affected the trial's fairness because she was unable to view the evidence against her and aid in her own defense." *Id.* ¶ 14. "The presentation of evidence at trial is undoubtedly a critical stage of the proceeding, and here, the video of the traffic stop involved a significant portion of the evidence against" the defendant. *Id.* ¶ 15. Not only did the defendant not see the video during trial, "no evidence, let alone affirmative evidence, indicates that she viewed the video before trial." *Id.* ¶ 16. The defendant needed to know what was on the video, not just that it existed, to decide whether to testify. *Id.* ¶¶ 19-20. While "counsel could provide a summary of the contents of the video," for purposes of the defendant's "decision to testify or not, counsel's gloss on the evidence is no substitute for her own knowledge." *Id.* ¶ 20.

¶ 21    In *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 31, a defendant convicted of aggravated driving under the influence similarly contended that "her right to a public trial was violated when the trial court viewed the video recording of the traffic stop and field sobriety tests in chambers during a break in the trial." Counsel had not objected to the court doing so. *Id.* ¶ 19. Acknowledging

that counsel cannot waive a defendant's right to be present, the *Groebe* court addressed the defendant's right to be present and found that she did not establish that her absence from the video viewing caused the proceedings to be unfair or deprived her of an underlying substantial right. *Id.* ¶¶ 50-52. Unlike *Lucas*, the *Groebe* "defendant has pointed to no statements by the trial court, referencing what was depicted in the video as forming an independent basis for its judgment," and factors other than the video were determinative in the court's decision, so that there was nothing to "suggest the trial court's procedure prejudiced defendant's ability to aid in her defense or to decide whether to testify." *Id.* ¶ 52.

¶ 22 This court has considered various cases where a defendant claimed that the right to be present at critical stages and the right to a public trial were violated by the defendant's absence as the trial court viewed videos of victim-sensitive interviews (VSIs) under section 115-10; we considered these cases under plain error as the claims were not preserved by objection. *People v. Rodriguez*, 2022 IL App (1st) 200315, ¶¶ 98-110; *People v. Martinez*, 2021 IL App (1st) 172097, ¶¶ 60-69; *People v. Myles*, 2020 IL App (4th) 180652, ¶¶ 56-65. In these cases, we found no error because the record affirmatively established that the defendants had seen the videos, and thus were aware of all the State's evidence when the decision came whether to testify.

¶ 23 Defendant cites *People v. Flagg*, 2021 IL App (1st) 191692-U, as persuasive authority. See Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023). In *Flagg*, a defendant contended that the court violated his right to be present when it viewed video of a VSI in chambers during trial, while the State responded that the defendant forfeited the claim and that viewing the video was not a critical stage. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 44. "The record shows that the trial court did not view the video during the section 115-10 hearing, where defendant was present, and then viewed the video

in chambers at trial." *Id.* ¶ 49. This court found that the record did not establish that the defendant saw the video outside of court, where his pretrial statement that his attorneys "sped through" a video did not specify which video, defense requests to bring a laptop into prison to review video evidence did not establish that the visits actually occurred, and the provision of a summary of the VSI to the defense did not establish that the defendant read it. *Id.* "Based on these facts, we find that the court erred by viewing the VSI video in chambers rather than playing it in open court in defendant's presence, and this error constituted second-prong plain error because it denied defendant his constitutional right to be present at all critical stages of proceedings." *Id.* ¶ 51.

¶ 24 The *Flagg* court rejected the State's argument that in-chambers viewing of the video was not a critical stage because the other evidence of the defendant's guilt was strong, stating that "the strength of the other evidence does not impact our analysis here" and is not part of the analysis of a second-prong plain error claim. *Id.* ¶ 55. The *Flagg* court also distinguished *Groebe*, where "we emphasized that there was no indication the trial court gave the video any weight in making its findings," while in *Flagg* "the court considered the video in its credibility determinations and guilty finding." *Id.* ¶ 53.

¶ 25 The Fourth District of this court rejected the logic of *Flagg* in *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 72, where a defendant contended "that by viewing outside his presence *** the postarrest video of his interrogation, the circuit court violated his due-process right to a public trial." The contention was considered under plain error because counsel did not object to the court viewing the video in chambers. *Id.* The *Aquisto* court distinguished *Lucas* on the basis that, in *Lucas*, "the circuit court viewed the video *before* admitting the video in evidence" while in the case before it, "it appears that the circuit court viewed the video *after* admitting the video in

evidence." (Emphases in original.) *Id.* ¶ 73. In *Flagg*, by contrast, the court viewed the video at issue after it was admitted into evidence. *Id.* ¶ 74.

¶ 26    Considering *Flagg*, the *Aquisto* court cited favorably its earlier unpublished decisions that the trial court's consideration of already-admitted evidence is not itself a proceeding. *Id.* ¶ 81 (citing *People v. Maniwa*, 2021 IL App (4th) 190796-U, and *People v. Duckworth*, 2021 IL App (4th) 180740-U). An "admitted video was comparable to admitted documentary evidence and *** the defendant's presence in chambers as the judge reviewed an admitted video would not have contributed to the defendant's ability to mount a defense any more than if the defendant were present in chambers as the judge reviewed documentary evidence." *Id.* Acknowledging the reasoning in *Flagg* that "the defendant could have made a better-informed decision of whether to take the stand and testify on his own behalf" (*id.* ¶ 82) had he seen the video, the *Aquisto* court found that *Flagg* leads to "an implausible conclusion: a judge would be forbidden to read, in the privacy of chambers, a document admitted in evidence unless the record affirmatively disclosed that the defendant personally had read the document first." *Id.* ¶ 83.

¶ 27    The *Aquisto* court also briefly addressed the right to be present, finding that the "defendant offers no convincing explanation of how his presence in chambers during the viewing of the postarrest video would have contributed to the fairness of the procedure." *Id.* ¶ 84. The video was disclosed in discovery, "[a]s far as we know, nothing prevented defendant from watching the video himself," and "[s]ince the video was of defendant's being interviewed by the police, he must have known what was in the video." *Id.*

¶ 28    After carefully reviewing the record and applying the aforementioned principles to the specifics of defendant's case, we find no second-prong plain error. Even assuming the court erred

in viewing the security and statement videos outside defendant's presence, we find that the fairness of defendant's proceedings was not affected by his absence from that viewing.

¶ 29 It is true that the videos were admitted into evidence at trial and then viewed by the court outside of open court or defendant's presence. Unlike *Myles*, *Martinez*, and *Rodriguez*, the record does not establish that defendant saw the videos outside court. Unlike *Groebe*, where we found no indication that the court gave the video any weight, we cannot say that the videos were not a significant factor in defendant's conviction when the videos comprised much of the substantive evidence against him.

¶ 30 However, like *Aquisto* "the video was of defendant's being interviewed by the police," so that "he must have known what was in the video." *Aquisto*, 2022 IL App (4th) 200081, ¶ 84. See also *Duckworth*, where the recording was of the defendant's own testimony in another proceeding, "of which he had firsthand knowledge." *Duckworth*, 2021 IL App (4th) 180740-U, ¶ 116. Similarly, the security video provided a perspective on an event or occurrence in which defendant participated. Defendant was aware of the evidence against him. He was fully informed that the videos of his run through the alley and his interview existed. He in fact had made the star cameo appearance in the videos. See *Lucas*, 2019 IL App (1st) 160501, ¶ 27 (Lavin, P.J., dissenting). Conversely, the VSI in *Flagg* is highly distinguishable: a defendant would have absolutely no firsthand or direct knowledge of what an alleged victim said in an interview and would have to view the video (or read a transcript) to gain that knowledge. Under these circumstances, we conclude that defendant has failed to show that he was deprived of the opportunity to defend himself or the knowledge needed to decide whether to testify. Thus, he has not shown second-prong plain error.

¶ 31    Defendant also argues that the error here was first-prong plain error as the evidence as to the object defendant carried was closely balanced. To be convicted of AUUW, defendant had to possess a firearm, which is defined as "any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas," with enumerated exceptions such as paint ball guns or certain BB guns. 430 ILCS 65/1.1 (West 2016); 720 ILCS 24-1.6(a)(1) (West 2018). Defendant argues there was conflicting evidence as to whether he had knowledge of or familiarity with firearms sufficient to identify the object he held as a firearm.

¶ 32    However, familiarity with firearms and the ability to distinguish among various types of firearms is not necessary to find a witness's testimony that a defendant possessed a firearm sufficient. *People v. Charles*, 2018 IL App (1st) 153625, ¶ 29. Further, defendant admitted in his statement that he could distinguish between a revolver and a semiautomatic gun (*i.e.*, he had some familiarity with firearms), held a gun, and believed the gun to be loaded because it was heavy. Proof a brandished object constitutes a firearm can be established by the testimony of a single witness who provides sufficient facts to support an objective conclusion that the object was a firearm, even if the witness had no training, experience, or knowledge of firearms. *People v. Collins*, 2021 IL App (1st) 180768, ¶ 52; *People v. Clifton*, 2019 IL App (1st) 151967, ¶ 33. Such facts include physical properties like the weight of an object. *Charles*, 2018 IL App (1st) 153625, ¶ 29. Although defendant raises the possibility that the "gun" he held does not meet the technical definition of "firearm," we need not elevate all *possible* explanations consistent with innocence to the level of reasonable doubt. *Id.* ¶ 30. Thus, even accepting *arguendo* that defendant did not have

much familiarity with firearms, we nonetheless find the evidence of his guilt was not closely balanced and therefore he has not shown first-prong plain error.

¶ 33    Having found neither first-prong nor second-prong plain error, we must honor defendant's forfeiture of his claim. Accordingly, the judgment of the circuit court is affirmed.

¶ 34    Affirmed.